UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| JENELL C.,[1] | ) |
| | ) No. 21 CV 6722 |
| Plaintiff, | ) |
| | ) |
| v. | ) Magistrate Judge Young B. Kim |
| | ) |
| MARTIN J. O'MALLEY, | ) |
| Commissioner of Social Security, | ) |
| | ) October 9, 2024 |
| Defendant. | ) |

**MEMORANDUM OPINION and ORDER**

Jenell C. seeks disability insurance benefits ("DIB") and supplemental security income ("SSI") asserting she is disabled by refractory ulcerative colitis status post colectomy with permanent ostomy and proctectomy and other physical and mental impairments. She brings this action pursuant to 42 U.S.C. § 405(g) for judicial review of the final decision of the Commissioner of Social Security denying her applications for benefits. For the following reasons, Jenell's remand request is granted:

**Procedural History**

Jenell filed applications for DIB and SSI in June 2019, alleging disability onset of January 21, 2018. (Administrative Record ("A.R.") 17.) Her applications were denied initially and upon reconsideration at the administrative level. (Id. at 84-109, 112-41.) Jenell then sought and was granted a hearing before an Administrative Law Judge ("ALJ"). (Id. at 168-69, 200-15.) She appeared with her attorney at a January

---

[1] Pursuant to Internal Operating Procedure 22, the court uses Jenell's first name and last initial in this opinion to protect her privacy to the extent possible.

2021 hearing, during which Jenell, medical expert ("ME") Dr. Gilberto Munoz, and a vocational expert ("VE") testified. (Id. at 40-83.) The ALJ issued her decision in April 2021, ruling that Jenell is not disabled. (Id. at 14-39.) The Appeals Council denied Jenell's request for review, (id. at 1-6), making the ALJ's decision the final decision of the Commissioner, *Jozefyk v. Berryhill*, 923 F.3d 492, 496 (7th Cir. 2019). Jenell then filed this action seeking judicial review, and the parties consented to this court's jurisdiction. *See* 28 U.S.C. § 636(c); (R. 7).

## Analysis

Jenell argues that the ALJ's opinion analysis, subjective symptom evaluation, and physical and mental RFC assessments lack the support of substantial evidence. (R. 16, Pl.'s Mem. at 4-15.) When reviewing the ALJ's decision, the court asks only whether the ALJ applied the correct legal standards and whether the decision has the support of substantial evidence, *Burmester v. Berryhill*, 920 F.3d 507, 510 (7th Cir. 2019), which is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," *Biestek v. Berryhill*, 587 U.S. 97, 103 (2019) (quotation and citations omitted). This deferential standard precludes the court from reweighing the evidence or substituting its judgment for the ALJ's, allowing reversal "only if the record compels" it. *Deborah M. v. Saul*, 994 F.3d 785, 788 (7th Cir. 2021) (quotation and citation omitted). However, the ALJ must "provide a logical bridge between the evidence and his conclusions." *Butler v. Kijakazi*, 4 F.4th 498, 501 (7th Cir. 2021) (internal quotation and citation omitted). Put another way, the ALJ's "analysis must say enough to enable a review of whether the ALJ considered the totality of a claimant's limitations." *Lothridge v. Saul*, 984 F.3d 1227, 1233 (7th Cir.

2

2021). "All [that is] require[d] is that ALJs provide an explanation for how the evidence leads to their conclusions that is 'sufficient to allow [the] reviewing court[] to assess the validity of the agency's ultimate findings and afford [Plaintiff] meaningful judicial review.'" *Warnell v. O'Malley*, 97 F.4th 1050, 1054 (7th Cir. 2024). To warrant reversal, a claimant must do more than "nitpick the ALJ's order." *Morales v. O'Malley*, 103 F.4th 469, 471 (7th Cir. 2024). Indeed, a claimant "must demonstrate with references to evidence why the ALJ's determinations lack substantial support in the administrative record." *Id.* Having considered the arguments and record under this standard, the court finds that remand is warranted.

**A.  Opinion Evidence**

Jenell argues that the ALJ erred in her analysis of the opinion evidence by failing to address the portion of the ME's hearing testimony in which he confirmed that absences from work during fibromyalgia and arthritis "flare-ups" would be consistent with those diagnoses. (R. 16, Pl.'s Mem. at 12-13 (citing A.R. 76-77).) The ALJ may not "defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s)." 20 C.F.R. §§ 404.1520c(a), 416.920c(a). Instead, the ALJ must determine the persuasiveness of all medical opinions in the record by considering and explaining the most important factors—supportability and consistency. *Id.* §§ 404.1520c, 416.920c(b)(2); *see also Albert v. Kijakazi*, 34 F.4th 611, 614 (7th Cir. 2022). The supportability factor requires the ALJ to consider the objective medical evidence and explanations presented and used by the medical source. 20 C.F.R. §§ 404.1520c(c)(1), 416.920c(c)(1). The consistency factor requires

3

the ALJ to consider and explain how the medical opinion is consistent with all other medical and nonmedical sources. *Id.* §§ 404.1520c(c)(2), 416.920c(c)(2). After assessing these factors, the ALJ may, but is not required to, explain how she considered three other factors in her analysis—the medical source's relationship with the claimant, specialization, and other factors that tend to support or contradict the source's opinion. *Id.* §§ 404.1520c, 416.920c(b)(2).

The ME opined that Jenell can perform a full range of sedentary work and can occasionally drive and have exposure to extreme cold and vibrations, but "cannot climb ladders, ropes, or scaffolds" or "work at unprotected heights [or] around moving mechanical parts." (A.R. 70.) The ALJ found the ME's opinion "persuasive" and "well-supported by objective medical evidence contained in the record." (Id. at 29-30.) But in so finding, the ALJ did not consider that the ME responded "yes" when Jenell's attorney asked whether "absences from work during flares of [Jenell's] fibromyalgia or the arthritis [would] be consistent with her diagnoses," and later added that he "cannot tell the frequency." (Id. at 76-77.) The government contends that the ALJ need not address this testimony because it is not a "medical opinion" as defined by applicable regulations. (R. 22, Govt.'s Mem. at 2-3 (citing 20 C.F.R. § 404.1513(a)(2) (defining "medical opinion" as "a statement from a medical source about what you can still do despite your impairment(s) and whether you have one or more impairment-related limitations or restrictions" related to certain abilities, including the "ability to perform physical demands of work activities")).)

4

The court is not persuaded. The government cannot simply disregard "any statement from a medical expert that [she presumes] is not a medical opinion," but rather must consider "'[o]ther medical evidence,' which includes a medical source's 'judgements about the nature and severity of [the claimant's] impairments.'" *Marshall v. O'Malley*, No. 22 CV 662, 2024 WL 1327360, at *3 (W.D. Wis. March 28, 2024). And in determining the persuasiveness of the ME's testimony, the ALJ had a duty to address such testimony without omitting portions that contradicted her conclusion that Jenell is not disabled. *See Arnett v. Astrue*, 676 F.3d 586, 592 (7th Cir. 2012) (citations omitted) (ALJ "may not ignore entire lines of contrary evidence"); *Nimmerrichter v. Colvin*, 4 F. Supp. 3d 958, 969-70 (N.D. Ill. 2013) (ALJs "not allowed to cherry-pick the parts of the medical expert's testimony that supported his finding of no disability and ignore the part that didn't"). Here, the ALJ did not satisfy that duty.

The government also argues that "[r]egardless [of] whether flares of pain were possible given [Jenell's] diagnoses," such evidence does not prove that she "*actually* experienced flares or to what extent she experienced them." (R. 22, Govt.'s Mem. at 3 (emphasis in original).) But both the ALJ and the ME acknowledged Jenell's report that she required an assistive device, such as a cane or walker, "intermittently" because of "arthritis flares." (A.R. 22 (citing id. at 712 (July 2019 rheumatology note that Jenell reported need for assistive device "intermittently with arthritis flares"); 70 (ME testifying that Jenell's cane "is medically necessary when she has a flareup," although he could not "establish the severity of the flareups").) And the ALJ noted

5

that Jenell experienced "flares" throughout her pregnancy, (id. at 28-29 ("[A]bout four months prior to deliver[ing her daughter, Jenell] began to experience 'arthritis flares' particularly in her right hip/knee/ankle but reported benefit from physical therapy."); see also id. at 26 (citing id. at 712 (July 2019 rheumatology note that Jenell reported multiple "flares" in the 3 months leading up to the appointment))).

Despite the ME's testimony confirming Jenell's need for a cane during flare-ups and ALJ's finding that his opinion was persuasive, the ALJ presented the VE with a hypothetical that did not contemplate flare-ups or work absences that could occur because of them. (Id. at 76-80.) The ALJ provided no explanation for ignoring the ME's testimony regarding work absences or excluding them from the hypothetical. *See Jelinek v. Astrue*, 662 F.3d 805, 814 (7th Cir. 2011) (remand required where ALJ omitted key limitations in hypothetical to VE); *Steele v. Barnhart*, 290 F.3d 936, 942 (7th Cir. 2002) (ALJ elicited incomplete testimony from VE by omitting limitations from hypothetical); *Nimmerrichter*, 4 F. Supp. 3d at 969 (finding error where ALJ omitted limitation from hypothetical to VE). As such, the ALJ failed to supply substantial evidence to support her evaluation of the ME's opinion.

**B.     Symptom Assessment**

Jenell also complains that the ALJ's evaluation of her subjective symptom statements lacks the support of substantial evidence. (R. 16, Pl.'s Mem. at 13-15.) An ALJ's symptom evaluation is entitled to great deference and may only be reversed where "patently wrong." *Murphy v. Colvin*, 759 F.3d 811, 815-16 (7th Cir. 2014). But

6

the ALJ may not disregard subjective complaints "solely because they are not substantiated by objective medical evidence," *Hall v. Colvin*, 778 F.3d 688, 691 (7th Cir. 2015), and must consider factors such as medication efficacy and side effects, daily activities, treatment received, and precipitating pain factors in assessing the severity of the claimant's symptoms, SSR 16-3p, 2017 WL 5180304, at *7-8 (Oct. 25, 2017). The court will not disturb an ALJ's evaluation of a claimant's symptom description if it is logically based on specific findings and evidence in the record. *See Murphy*, 759 F.3d at 815.

Jenell claims that the ALJ failed to "assess[] the totality of the evidence" when analyzing her mental symptoms, focusing instead on a single sentence in her October 2019 psychological consultative exam reflecting Jenell's report that she was "fully independent and self-sufficient in all areas of living, including self-care and the ability to care for her newborn child." (R. 24, Pl.'s Reply at 4 (citing A.R. 1786).) However, in addition to this psychological consultative exam, the ALJ considered: (1) an early August 2020 psychiatry visit, (see A.R. 28 (citing id. at 4573 (August 3, 2020 visit with Dr. Elizabeth Whitham noting uncontrolled symptoms and pain in settings of acute stressors)); (2) a late August 2020 psychiatric follow-up visit where Jenell's psychiatric medication dosage decreased and she reported sleeping 8 hours per night and no longer experiencing nightmares, (see id. (citing id. at 4650 (August 25, 2020 visit with Dr. Whitham)); and (3) psychotherapy notes describing Jenell's mood as "anxious/sad/tearful" with a congruent affect but still "engaged and talkative," (see id. (citing id. at 4637, 4974, 5011-12, 5051, 5061)). There was no error here. *See Harris*

7

*v. Saul*, 835 Fed. Appx. 881, 886 (7th Cir. 2020) (analysis not "patently wrong" where ALJ highlighted relevant evidence). Jenell also argues that her ability to engage in the daily activities she reported during the October 2019 consultative exam does not equate to an ability to work, but in so doing she asks the court to reweigh the evidence. (See R. 16, Pl.'s Mem. at 13-15); *see also Deborah M.*, 994 F.3d at 788 (court will not reweigh evidence). In any case, there is no indication in the ALJ's decision that she drew such a conclusion. *See Buttles v. Kijakazi*, No. 20 CV 5617, 2023 WL 5220913, at *4 (7th Cir. Aug. 15, 2023) ("[N]othing in the decision suggests that the ALJ equated these activities of daily living with those of a full-time job.").

Jenell also argues, and here the court agrees, that the ALJ erred in assessing Jenell's physical symptom statements. (R. 16, Pl.'s Mem. at 8.) In deciding that Jenell's physical symptoms were not work-preclusive, the ALJ explained that Jenell "is noted to have a history of inflammatory bowel disease ['IBD'] well before the alleged onset date" and "[n]otwithstanding continued rectal discharge, she was no longer on medical management for colitis and healthy enough to conceive a child." (A.R. 28.) In so finding, the ALJ suggests that because Jenell was able to work in the past despite IBD symptoms, the same is true with respect to the relevant period. (R. 16, Pl.'s Mem. at 8.) But in the applicable period, Jenell had multiple invasive surgeries and started using an ostomy bag, which impacted her ability to perform full-time work. (See also A.R. 50 (Jenell testifying that "at [her] other job, [she] used to be able to lift and be physical and that's just not an option for me much anymore because if I do . . . that can give me a risk of a prolapse or a parastomal hernia and

8

that causes a lot of complications. My ostomy is permanent so keeping it safe and free of injury is one of my main priorities to probably survive.").) In other words, even though Jenell had IBD before her onset date, she did not have her ostomy bag or the functional limitations she now alleges. And as Jenell points out, the ALJ provides no basis for using her ability to conceive a child to discount the severity of symptoms alleged. (R. 16, Pl.'s Mem. at 8; see also A.R. 787 (July 2018 progress noting, "Patient is hoping to become pregnant. Been struggling with ongoing frequent passage of blood/mucous from rectum.").) On remand, the ALJ should revisit her analysis of Jenell's statements regarding her physical symptoms. *See Bjornson v. Astrue*, 671 F.3d 640, 647 (7th Cir. 2012) (cautioning against over-emphasizing activities that do not reflect full-time work).

**C.    Physical RFC**

Jenell also argues that the ALJ's physical RFC analysis lacks the support of substantial evidence because the ALJ "fail[ed] to make an affirmative finding as to how often and for how long [Jennell's] severe ulcerative colitis and IBD required her to use the bathroom." (R. 16, Pl.'s Mem. at 7). An RFC measures the tasks a person can perform given her limitations based on "all the relevant evidence" in the administrative record. 20 C.F.R. § 404.1545(a)(1); *see also Pepper v. Colvin*, 712 F.3d 351, 362 (7th Cir. 2013). The ALJ "must incorporate a claimant's limitations," including those that are not severe, in developing the RFC. *See Bruno v. Saul*, 817 Fed. Appx. 238, 242 (7th Cir. 2020); *see also Villano v. Astrue*, 556 F.3d 558, 563 (7th Cir. 2009) (finding that when assessing RFC, ALJ must "evaluate all limitations that

9

arise from medically determinable impairments, even those that are not severe, and may not dismiss a line of evidence contrary to the ruling"). Where the ALJ does not rely upon medical opinions, she must "thoroughly discuss[] the medical and other evidence," considering each of the claimant's "impairments and related function deficits," *Nina Joyce H. v. Saul*, No. 18 CV 4913, 2020 WL 212771, at *7 (N.D. Ill. Jan. 14, 2020), and "describ[e] how the evidence supports each [RFC] conclusion," *Norris v. Astrue*, 776 F. Supp. 2d 616, 637 (N.D. Ill. 2011). An ALJ's RFC analysis must "say enough to enable review of whether the ALJ considered the totality of a claimant's limitations," *Jarnutowski v. Kijakazi*, 48 F.4th 769, 774 (7th Cir. 2022), and must provide a "logical bridge" between the evidence and the conclusions, *Butler*, 4 F.4th at 501. However, a flawed RFC generally will not justify remand unless the claimant identifies additional limitations not already included in the RFC. *See Pavlicek v. Saul*, 994 F.3d 777, 784 (7th Cir. 2021).

Jenell underwent a total colectomy in July 2018 with end ileostomy for her severe refractory ulcerative colitis. (R. 16, Pl.'s Mem. at 1 (citing A.R. 835-38)); *see Michael G. v. Kijakazi*, No. 19 CV 6017, 2022 WL 4119775, at *2 (N.D. Ill. Sept. 9, 2022) (defining ileostomy as "a procedure to bring the small intestine to the surface of the skin so that waste can be collected in an external pouch (ostomy bag)."). Then in February 2020, Jenell underwent a proctectomy and had her anus and rectum fully removed. (A.R. 3492-95 (physician notes from February 2020 proctectomy surgery).)

Jenell has been dependent on her ostomy bag since the first surgery in July 2018. She testified that she needs to use the bathroom to empty her ostomy bag 7 to

10

10 times per day, and it takes 3 to 5 minutes each time. (Id. at 53.) She also changes the bag approximately every 3 days, which takes 30 minutes and sometimes requires Jenell to shower afterward. (Id.) Medical notes support Jenell's ostomy maintenance routine. (Id. at 787 (December 2018 progress note reporting that Jenell empties her ostomy bag "about 4-5 times daily" and was "struggling with ongoing frequent passage of blood/mucous from rectum"); 1767 (September 2019 medical note indicating that Jenell reported emptying her ostomy bag "7 times daily and 3 times in the middle of the night").) And despite her colectomy with ileostomy, Jenell experiences rectal bleeding approximately 7 times per day. (Id. at 787 (July 2018 progress note reporting "ongoing frequent passage of blood/mucous from rectum" with "[a]ssociated tenesmus, rectal spasm and lower abdominal cramping pain"); 513 (December 2018 consultation noting Jenell experiences rectal bleeding "despite having had a total colectomy"); 748 (April 2019 progress note reporting "blood pours right out of me" in connection with rectal bleeding and pain); 703 (July 2019 progress note reporting rectal bleeding).)

Also, after the removal of her rectum, Jenell experiences urinary incontinence and incomplete emptying, frequent urination, and leakage with a sense of urgency, and was diagnosed with stress incontinence, urinary-frequency syndrome, and myofascial pain of the pelvic floor "in the setting of colectomy and proctectomy for ulcerative colitis." (Id. at 27 (citing id. at 5024-29 (Dr. Elizabeth Mueller noting Jenell's pelvic floor muscle strength was 2/5)); see also id. at 63 (Jenell testifying her

11

"anus and rectum [were] removed, which means that the injury or wound is between [her] cheeks and so that area is very sensitive [and she has] a hard time sitting").)

When assessing Jenell's RFC, the ALJ determined that Jenell has the ability to perform "sedentary" work as defined in 20 C.F.R. § 404.1567(a), but she could:

> never climb ladders, ropes or scaffolds; occasionally climb ramps and stairs, balance, stoop, kneel, crouch and crawl; never be around unprotected heights and moving mechanical parts; occasionally drive; tolerate occasional exposure to extreme cold and vibrations; understand, remember and carryout simple routine instructions; and use judgment limited to simple work-related decisions.

(A.R. 24.) The ALJ presented the VE with a hypothetical based on the same. (Id. at 77-81.) When questioned by Jenell's counsel, the VE testified that if an individual needs to take "eight bathroom breaks per day and each of those lasts five minutes," the individual would not be able to maintain competitive employment. (Id. at 81.) Jenell's argument that the ALJ erred in crafting her physical RFC assessment is rooted in the contention that, had the ALJ credited Jenell's need for ostomy care and bathroom use, she would have been found disabled. (R. 16, Pl.'s Mem. at 7-8 (citing A.R. 80-81).)

The government responds that "it is not an ALJ's duty to define 'how often and for how long the individual must use the bathroom.'" (R. 22, Govt.'s Mem. at 8 (citing R. 16, Pl.'s Mem. at 7).) However, the ALJ does have a duty to "incorporate a claimant's limitations," *Bruno*, 817 Fed. Appx. at 242, and "may not dismiss a line of evidence contrary to the ruling," *Villano*, 556 F.3d at 563. Both Jenell's testimony, (A.R. 53), and the September 2019 progress note, (id. at 1767), support Jenell's need to use the bathroom at a frequency the VE deemed unemployable. The ALJ is silent

12

as to how she reconciled Jenell's testimony, the supporting medical evidence, and the VE's testimony with the RFC she assessed. *See Sikorski v. Berryhill*, 690 Fed. Appx. 429, 433 (7th Cir. 2017) (finding that because "[t]he ALJ made no finding regarding the required length of [the claimant's] bathroom visits, and we cannot speculate on facts not contained in the record . . . we cannot be confident that the ALJ provided the vocational expert with a 'complete picture' of [the claimant's] RFC").

The government also argues that Jenell's testimony that she uses the bathroom 7 to 10 times daily would not preclude employment because she referred to breaks "over the course of an entire day" and did not establish that emptying her ostomy bag "was a matter of urgency." (R. 22, Govt.'s Mem. at 9.) The government suggests that Jenell could attend to her ostomy bag during "normal breaks," which "usually consist[] of two fifteen-minute breaks and one thirty-minute lunch break." (Id.) As Jenell points out, the government's argument "is premised upon a faulty understanding of how [ostomy] bags operate." (R. 24, Pl.'s Reply at 7-8.) Jenell does not have control over when she must empty the ostomy bag. An ostomy bag alters the way waste leaves an individual's body and should be emptied when it is one-third to one-half full. (Id. at 7 (citing *Ileostomy*, Cleveland Clinic, https://my.clevelandclinic.org/health/treatments/21726-ileostomy (last visited Oct. 8, 2024) ("You won't have control of when poop comes out of the ostomy into the bag, so you'll need to wear your bag all the time.").) Indeed, the ostomy bag "must be emptied frequently as ileostomy output is a looser and thinner consistency, and thinner output must be emptied more often." *Katherine B. v. Saul*, No. 19 CV 257, 2020 WL 2786832,

13

at *2 (N.D. Ill. May 29, 2020) (citing *What is a Stoma?*, CliniMed, https://www.clinimed.co.uk/stoma-care/faqs/what-is-the-normal-output-for-a-stoma (last visited October 8, 2024)).

Jenell further testified that other variables impact her ostomy care. She needs to empty her ostomy bag more frequently if she eats or drinks more, and the time needed to empty the bag can vary depending on her diet and the amount of waste in the bag. (A.R. 53 (reporting that bag "has to be a certain size or I have to scoot and get into a position[,] so I don't spill everywhere").) In addition, "the amount of output alone does not determine when a person may need to empty the bag" because "[i]leostomy patients are prone to suffer from gas build up in their bags that would require emptying a bag even though it may not be 'full.'" *Katherine B.*, 2020 WL 2786832, at *3 ("Failure to relieve gas in a stoma bag may cause the bag to come loose from the skin."). In short, the government is wrong to suggest that Jenell could schedule her ostomy bag maintenance to adhere to a typical work-break schedule. *See also Stanley R. v. Saul*, No. 20 CV 1192, 2021 WL 2550540, at *4 (N.D. Ill. June 22, 2021) ("On remand the ALJ should take care to more fully develop the record to determine whether and, if so, how the specific frequency and duration of Plaintiff's bowel movements would interfere with his ability to work."); *Katherine B.*, 2020 WL 2786832, at *2-3 (ALJ erred by failing to analyze bathroom needs in RFC). Having failed to explain how she confronted the multiple sources addressing Jenell's bathroom needs, the court finds that the ALJ did not supply substantial evidence to support the physical RFC.

14

**D.     Mental RFC**

Finally, Jenell argues that the ALJ "inadequately accommodated" her concentration, persistence, or pace ("CPP") deficiencies in the RFC assessment. (R. 16, Pl.'s Mem. at 8-11.) An ALJ must consider "all relevant evidence to obtain a longitudinal picture of [the claimant's] overall degree of functional limitation" when reviewing a claimant's mental impairments. 20 C.F.R. § 404.1520a(c)(1). And "[a] list of evidence punctuated with a conclusion does not discharge an ALJ's duty to form a logical bridge between the evidence and his conclusion that [the claimant] has no marked limitations." *Pimental v. Astrue*, No. 11 CV 8240, 2013 WL 93173, at *9 (N.D. Ill. Jan. 8, 2013).

The ALJ found that Jenell's depression and anxiety are severe but do not cause marked or extreme limitations. (A.R. 20, 23-24.) To be sure, the ALJ evaluated the paragraph B criteria and determined that Jenell has mild limitations in understanding, remembering, or applying information, interacting with others, and adapting or managing oneself, and a moderate limitation in the area of CPP. (Id. (describing CPP as an "area of mental functioning and demonstration of useful ability to focus attention, and stay on task at a sustained rate"); *see also* 20 C.F.R. § 404.1520a(c)(3). To account for Jenell's moderate CPP limitation, the ALJ said that "she is limited to performing work involving understanding, remembering and carrying out simple routine instructions, and using judgment limited to simple work-related decisions." (Id. at 29.)

Jenell argues the RFC fails to accommodate her CPP limitation, claiming that the "ability to stick with a given task over a sustained period is not the same as the ability to learn how to do tasks of a given complexity." (R. 16, Pl.'s Mem. at 8-9 (citing *Varga v. Colvin*, 794 F.3d 809, 814 (7th Cir 2015).) Moreover, Jenell argues that the language in the RFC "spoke to deficiencies in understanding, remembering, or applying information," rather than CPP. (R. 16, Pl.'s Mem. at 8.) The government responds that "the complexity of a task is[] relevant to a person's ability to function in the broad category of [CPP]" and "[i]t matters not that the ability to perform certain tasks also relates to other broad categories of functioning such as understanding, remembering, or applying information." (R. 22, Govt.'s Mem. at 12). The government also suggests that if Jenell's limitation were work-preclusive, it would require a rating of "extreme." (Id. at 11-12 (citing 20 C.F.R. § 404.1520a(c)(4) (extreme limitation defined as a "degree of limitation that is incompatible with the ability to do any gainful activity")).) However, Jenell argues that the ALJ failed to adequately address her CPP limitation, not that a moderate CPP limitation is necessarily work-preclusive. (See R. 24, Pl.'s Reply at 10 ("[A] moderate limitation is not the same as 'no' limitation." (quoting *Donald R.R., Jr. v. Comm'r*, No. 19 CV 721, 2020 WL 1503579, at *11 (S.D. Ill. March 30, 2020)).)

The Seventh Circuit has repeatedly rejected RFCs where CPP limitations fail to address the claimant's ability to sustain work. Most recently, in *Kreck v. O'Malley*, No. 22-1716, 2024 WL 3935441, at *1-*3 (7th Cir Aug. 24, 2024), the Seventh Circuit reasoned that limiting a claimant to "simple, routine work involving simple

16

instructions, simple decision-making, no multitasking, and an average, nonvariable pace" was insufficient to address durational aspects of a moderate CPP limitation. *See also Lothridge v. Saul*, 984 F.3d 1227, 1233 (7th Cir. 2021) (ALJ's analysis says nothing about whether claimant "is capable of performing work at a sustained pace over an entire workday"); *Crump v. Saul*, 932 F.3d 567, 570 (7th Cir. 2019) ("Merely limiting [claimant] to simple, routine, and repetitive tasks with few workplace changes was not enough to address her limitations and ensure that she could maintain the concentration and effort necessary to function in a workplace and otherwise sustain employment.").

Here, the ALJ did not explain how limiting Jenell to simple, routine instructions and simple, work-related decisions addressed Jenell's panic symptoms or otherwise accommodated her moderate CPP limitation. For this reason, remand is also warranted on this ground. Given the errors identified in the ALJ's analysis of the opinion evidence and symptom assessment, along with the ALJ's failure to adequately address Jenell's ostomy care and CPP limitation, a new RFC assessment may be warranted on remand, which may in turn result in one or more new hypotheticals being presented to a VE. When reassessing the RFC, the ALJ should sufficiently articulate why she has incorporated—or omitted—limitations arising from Jenell's medically determinable impairments, including her ostomy care and CPP limitations.

17

## Conclusion

For the foregoing reasons, Jenell's remand request is granted, and the matter is remanded for further proceedings.

        **ENTER:**

        _____
        **Young B. Kim**
        **United States Magistrate**

18